UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

————————————————————————X

BENJAMIN M. TYLER, III and
WANDA J. TYLER,

                  Plaintiffs,

      -against-

SUREWAY AIR TRAFFIC CORPORATION,
GAIL GOLD and RICHARD GOLD, as Trustees
under the Testamentary of CHARLES GOLD,
Individually and d/b/a GOLD WINGS, OSCAR M.
GALDAMEZ, and LYNXWAYS, INC.,

                  Defendants.

————————————————————————X

**OPINION & ORDER**
**CV-00-4545 (SJF)(RML)**

FILED
IN CLERKS OFFICE
U.S. ⬥⬥ COURT ED N.Y:
★ DEC 12 2005 ★
P.M. ————
TIME A.M. ————

FEUERSTEIN, J.

      Benjamin M. Tyler, III (Benjamin) and Wanda J. Tyler (Wanda) (collectively, plaintiffs)

commenced this diversity action against, *inter alia*, defendants Sureway Air Traffic Corporation

(Sureway), Oscar M. Galdamez (Galdamez) and Lynxways, Inc. (Lynxways, Inc.) (collectively,

defendants) to recover damages for personal injuries allegedly sustained by Benjamin as a result

of a motor vehicle accident[1]. Defendants now move pursuant to Rule 56 of the Federal Rules of

Civil Procedure for summary judgment dismissing the complaint. For the reasons stated herein,

defendants' motion is denied.

---

[1] The claims against defendants Gail Gold and Richard Gold, as Trustees under the
Testamentary of Charles Gold, individually and d/b/a Gold Wings, were voluntarily discontinued
without prejudice on April 8, 2004.

1

I.    BACKGROUND

    A.    Factual Background[2]

On or about September 10, 1999, Galdamez was operating a 1995 General Motors Corporation (GMC) truck bearing New York State registration number XY4789, which was owned by Sureway.  On that same date, Benjamin was operating a 1999 tractor-trailer bearing Iowa State registration number PS7927 during the course of his employment with Ruan Transport Corporation a/k/a Single Source.  Benjamin contends that at approximately 4:00 a.m. on that date, his tractor-trailer was stopped in an eastbound lane on the Gowanus Expressway, at or near the intersection of 77th Street in the County of Kings, State of New York, when it was hit in the rear by the truck operated by Galdamez.

Following the accident, Benjamin was treated in the emergency room at Lutheran Medical Center in Brooklyn, where, according to the emergency room records, he complained of back spasms with a tingling sensation and numbness, pain and cramping on the left side of his neck, and decreased sensation in his right thigh as compared to his left.  Impression was of neck and back muscle strain.  Benjamin testified at his deposition that he was discharged from the emergency room after two to two-and-a-half hours; that he went by subway to the Bronx to retrieve his truck; that he then drove his truck to the area of Elizabeth, New Jersey, where he unloaded his freight; and that he then returned to his home in Centreville, Maryland.  Benjamin further testified that the next night, he drove his truck to Richmond, Virginia, then on to Maine.

_____

[2] The facts are derived from defendants' statement of material facts pursuant to Local Rule 56.1 and the accompanying affidavits and other evidentiary material filed in support of defendants' motion for summary judgment, as well as plaintiffs' statement of disputed material facts and the accompanying declarations and evidentiary material filed in response to the motion. The facts are undisputed unless otherwise indicated.

Following his release from the hospital, Benjamin did not seek medical treatment until September 15, 1999, approximately five days after the accident. At that time, he was treated by Dr. Douglas Beckwith at the Chester Family Medcare (the Medcare) for complaints of pain between his shoulder blades, up and down his spine and in his neck, and headaches. Dr. Beckwith prescribed pain medication and instructed Benjamin to stay out of work from September 15, 1999 through September 27, 1999.

Benjamin next received medical treatment on September 21, 1999 from Dr. James Lucas, a dentist, for complaints of pain in his temporomandibular joint (TMJ) area, headaches, discomfort and ringing in his ears, and difficulty eating hard foods because of the pain. Dr. Lucas diagnosed Benjamin with bilateral TMJ syndrome.

Benjamin next received medical treatment on October 1, 1999 from Dr. Ciganek[3], at which time he complained of neck and low back discomfort, headaches and numbness in his right thigh. Dr. Ciganek's notes reveal that Benjamin had already returned to work prior to the initial visit. Dr. Ciganek's examination of Benjamin revealed that the range of motion of his neck was about seventy-five percent (75%). (Transcript of the deposition of Dr. Eric Ciganek on January 13, 2005 [Ciganek Dep.], p. 63). Dr. Ciganek diagnosed Benjamin with cervical and lumbar strain and prescribed pain medication and physical therapy. At his deposition, Dr. Ciganek testified that based upon the history he was given by Benjamin, it was his opinion, to a reasonable degree of medical certainty, that Benjamin's back and neck pain was caused by the motor vehicle accident in September 1999. (Id. at 29).

---

[3] The parties stipulate that Dr. Ciganek is a board certified family practitioner with an expertise in that area.

3

Dr. Ciganek's records also indicate that as early as June 3, 1997, over two years prior to the accident, Benjamin complained of neck pain, and that on March 14, 1998, Benjamin was involved in a car accident in which his car was totaled, and as a result of which he complained of back discomfort and headaches (the prior accident). Dr. Ciganek's examination of Benjamin at that time revealed muscle spasms in Benjamin's upper and lower back. Following that prior accident, Benjamin received physical therapy for neck and back pain through May 20, 1998. He also returned to Dr. Ciganek on April 24, 1998 complaining of continued low back pain. At his deposition, Dr. Ciganek testified that the prior motor vehicle accident was not a contributing cause of Benjamin's current neck and back pain because it had occurred approximately eighteen months earlier; he only treated Benjamin twice after that accident and then not again for a period of sixteen or seventeen months; and he does not have any notes indicating that Benjamin had seen any other doctors following that accident. (Ciganek Dep., p. 30). Thus, according to Dr. Ciganek, he "assume[d] that [Benjamin's injuries] resolved." (Id.).

Benjamin received physical therapy at Tidewater Physical Therapy (Tidewater) approximately two times a week from October 8, 1999 until January 7, 2000, for a total of twenty-five visits. At the initial evaluation, Benjamin complained of constant pain; headaches; numbness in his neck, left arm and fingertips and right thigh; and weakness in his legs. The records from Tidewater further indicate that Benjamin stated that a brace helped him with driving.

Radiology reports from Memorial Hospital at Easton, MD Inc. (Memorial Hospital) indicate that views of Benjamin's lumbosacral spine taken on October 22, 1999 were negative and that views of his cervical spine taken that same date revealed mild degenerative changes at

4

C3-4, C5-6 and C6-7, but "[n]o evidence of acute osseous pathology."

Benjamin also received medical treatment from Dr. Mason at Chesapeake Orthopedics from November 1, 1999 until February 2000 for complaints of neck pain, intermittent low back pain, headaches, and numbness and tingling in his right hand and right thigh. Dr. Mason's records indicate that Benjamin's past medical history was significant for lumbar strain five to six years earlier and for intermittent low back pain. Dr. Mason gave Benjamin a note excusing him from work from November 12, 1999 through November 19, 1999 and from December 10, 1999 through December 17, 1999. Dr. Mason sent Benjamin for MRIs of the cervical, thoracic and lumbar spine. Following the MRIs, Dr. Mason diagnosed Benjamin with mild cervical and lumbar stenosis. Dr. Mason prescribed a cervical collar and pain medication and advised Benjamin to have a whole body scan performed to define T2 signal abnormalities found on the MRI of the thoracic spine. In a report dated April 18, 2000, Dr. Mason indicates that the mild cervical and lumbar stenosis had been "developing over a number of years," but it was "exacerbated and made symptomatic by" the motor vehicle accident on September 10, 1999.

A report of a nuclear bone scan performed on Benjamin at Memorial Hospital on November 30, 1999 was normal.

From December 13, 1999 through September 4, 2002, Benjamin received four cervical epidural steroid injections, five lumbar epidural steroid injections, and a right-sided L3-4 and L4-5 facet injection from Dr. Ding at the Shore Health System Pain Management/Palliative Care Center. Benjamin last treated with Dr. Ding on March 11, 2004.

In April 2000, Benjamin treated with Dr. Benjamin Knox at the Delmarva Orthopaedic Clinic. Dr. Knox diagnosed Benjamin with cervical and lumbar spondylosis with superimposed

5

disease at L4-5, and a synthetic degenerative disc disease at L3-4. At his deposition, Dr. Hermantin testified that the development of the spondylolisthesis "may have happened sometime ago. It's a question of when it became symptomatic. * * * Five percent of the population has a spondylolisthesis * * *." (Hermantin Dep., p. 28). Dr. Hermantin further testified that increased stress placed on the structure may cause pain arising from previously asymptomatic degenerative conditions such as spondylosis or spondylolisthesis and that such increased stress was caused by the September 10, 1999 motor vehicle accident. (Id. at 114). Dr. Hermantin recommended a fusion at the L4-5 level, which he testified was the primary pain generator. (Id. at 31).

By note dated January 14, 2003, Dr. Hermantin added an addendum to his previous notes to clarify that, according to the history given to him by Benjamin, the cause of Benjamin's low back pain was the September 10, 1999 motor vehicle accident. A subsequent note indicates that Benjamin's low back pain is directly related to the September 10, 1999 motor vehicle accident. At his deposition, Dr. Hermantin testified that although Benjamin did not inform him at the initial evaluation that he had injured his neck and back in a prior motor vehicle accident, his opinion that the September 1999 motor vehicle accident was the cause of Benjamin's low back symptoms was unchanged because Benjamin's prior symptoms appeared to have resolved, insofar as he was not seeking ongoing medical care. (Hermantin Dep., pp. 37-38, 71-73, 97-99).

On or about March 2, 2001, following a physical examination, the Department of Transportation recertified Benjamin to drive a truck.

Benjamin treated with Dr. Thomas Ducker, a neurosurgeon, in March 2002 complaining of pain in the cervical and lumbar spine, tingling in the cervical spine and left arm, numbness in the left shoulder and both thighs, and weakness in the lumbar spine. Dr. Ducker's records

indicate that there were some minor changes at Benjamin's L4-5 level, "but this can occur in anybody age 50." Dr. Ducker's records further indicate that Benjamin was not a good candidate for operative care. At Dr. Ducker's suggestion, a left-sided lateral block at C3-4 was performed on Benjamin on April 23, 2002. At a follow-up visit in July 2002, Dr. Ducker ruled out significant discogenic disease and noted that Benjamin was not an ideal candidate for surgical intervention.

On November 4, 2002, an MRI was performed on Benjamin's lumbar spine at Kent & Queen Anne's Hospital. The MRI revealed moderate central spinal stenosis at L4-L5 secondary to grade I spondylolisthesis, diffuse disc bulging, facet and ligamentous enlargement, "rather severe" bilateral L4 neural foraminal narrowing, and moderate L3 neural foraminal narrowing related to right L3-L4 posterolateral disc protrusion. On that same date, radiological views were also taken of Benjamin's lumbar spine, which revealed degenerative disc changes at the L4-L5 level.

On December 3, 2002, a discography was performed of Benjamin's lumbar spine. The report of the procedure indicates that Benjamin's L2-L3 and L5-S1 disks were normal; there were some degenerative changes at the L3-L4 level, though no clinically significant symptoms were produced on distension of that disk; and there was a major discogenic pain mechanism at the L4-L5 intervertebral axis.

A videotape of surveillance of Benjamin conducted from February 25, 2003 through February 28, 2003 shows, *inter alia*, Benjamin climbing into a dumpster and jumping, walking without a limp, ascending and descending stairs with no apparent difficulty, getting in and out of various vehicles without any apparent difficulty, bending and lifting various objects, sweeping,

8

and shoveling snow.

Benjamin's employment records from Southern States Cooperative, Inc., where he works as a truck driver, indicate that on October 24, 2003, Benjamin met the requirements of a Lifting Skills Test, which required him to load six (6) 50-pound bags or two cases of motor oil onto a hand-truck; to move the hand-truck at least twenty (20) feet; to unload the bags one-by-one, or the two cases together, and stack them on the floor; and to pick up one of the bags, or both of the cases, and carry it/them at least twenty (20 ) feet and set it/them onto the floor. In addition, a Performance Appraisal completed on October 21, 2004 indicates that Benjamin was "fully competent" in demonstrating adequate physical ability to perform tasks.

At his deposition on May 18, 2004, Benjamin testified that he has a constant ringing in his ears, pain in his jaw, constant pain in his neck and lower back, numbness in his left shoulder area and right thigh, and intermittent pain in his left foot. (Deposition of Benjamin Tyler, III [Plf. Dep.], pp. 59-60). Benjamin also testified that he cannot mow his grass without stopping because of back and leg pain, that he is unable to have a physical relationship with his wife, and that he has walked with a limp since the accident because of leg weakness. (Id. at 60-61, 70).

### 1.    Defendants' Experts

Defendants submit a narrative report from Dr. Marina Neystat dated May 19, 2004 regarding an independent neurological examination she conducted of Benjamin on that date. Dr. Neystat "declare[s] under the penalties of perjury * * * [that the report is] true to the best of [her] knowledge and information." In her narrative report, Dr. Neystat indicates that Benjamin complained, *inter alia*, of headaches; ringing in his ears; pain and numbness in his neck, left

9

shoulder, and left fingers; pain in his thoracic spine, lower back, right leg, bilateral knees and left toes; and numbness in his right thigh. Benjamin informed Dr. Neystat of the prior motor vehicle accident, but denied sustaining any injuries as a result of it. Dr. Neystat's examination of Benjamin revealed decreased sensation to pin prick and light touch of the right leg, normal gait, normal cervical range of motion, cervical paraspinal tenderness, limited lumbar range of motion and positive straight leg raise testing at 45 degrees on the right. Dr. Neystat diagnosed Benjamin with cervical and lumbar sprain with radiculopathy, degenerative spine disease, and chronic back pain syndrome. Dr. Neystat opined that Benjamin has a mild partial disability from a neurological point of view and that he may continue with his working duties and daily life activities with the restriction of no heavy lifting over twenty (20) pounds.

Defendants also submit a narrative report of Dr. Edward S. Crane, dated May 20, 2004, regarding an independent orthopedic examination he conducted of Benjamin. Dr. Crane certifies and affirms "under penalty of perjury * * * [that the report is] true to the best of [his] knowledge." In his report, Dr. Crane indicates that Benjamin complained to him, *inter alia*, of constant neck pain radiating to his left shoulder; numbness in his left shoulder, left index and middle fingers and right thigh; constant lower back pain; and intermittent pain in both legs and in two of his left toes. Benjamin denied any prior injury to his neck, shoulders or arm, but admitted to pulling his lumbar muscle in 1993 and to straining his lower lumbar area after a 1998 motor vehicle accident. Dr. Crane's examination of Benjamin revealed, *inter alia*, complete cervical range of motion, mild tenderness to palpation over the left sternomastoid, decreased pinprick sensation in the right thigh and normal gait. Dr. Crane concluded that there was no objective evidence of any orthopedic abnormalities with the exception of the decreased pinprick sensation

10

in the right thigh, which he indicated is commonly seen as part of the normal aging process, secondary to lumbar spinal stenosis.

In addition, defendants submit an affirmation of Dr. Andrew Litt, dated March 15, 2005, regarding his review of the diagnostic tests performed on Benjamin. In his affirmation, Dr. Litt indicates, *inter alia*, that an MRI of Benjamin's lumbar spine performed on February 15, 2000 revealed degenerative disc disease, mild bulging of the disc at the L4-L5 level, no disc herniation, and no spinal stenosis, and that a subsequent MRI of the lumbar spine performed on November 4, 2002 revealed no change. Dr. Litt opined, "within a reasonable degree of medical certainty that these diagnostic images reveal that the changes in Benjamin's cervical and lumbar spine are degenerative in nature and are not the result of a single traumatic event or injury * * *." (Affirmation of Dr. Andrew Litt [Litt Aff.], ¶ 22).

### 2. Plaintiffs' Expert

On August 16, 2004, Benjamin was seen in neurological consultation by Dr. William B. Head, Jr. Dr. Head's records indicate that Benjamin did not bring any diagnostic test results with him to the examination and that he denied any past history of similar symptoms or of prior work related injuries or trauma, with the exception of a pulled lumbar muscle in the 1980s. According to Dr. Head, Benjamin complained to him of headaches; neck, low back and bilateral leg pain; numbness in his right fingers, right thigh and left shoulder; some memory, concentration and comprehension impairment; difficulty talking; ringing in both ears; and reduced hearing in his left ear. (Affidavit of Dr. William B. Head [Head Aff.], ¶ 3). Dr. Head's examination of Benjamin disclosed a normal gait; no evidence of memory, concentration or comprehension

11

impairment or of any cognitive abnormality; decreased sensation to pinprick involving the right thigh and calf; clicking in both TMJ areas; restricted range of motion of the cervical and lumbosacral spine; and hearing loss. Specifically, Dr. Head indicates that the range of motion testing he conducted of Benjamin's cervical spine was thirty percent (30%) of normal on attempted lateral rotation and lateral flexion testing, and that the range of motion testing he conducted of Benjamin's lumbarsacral spine was thirty percent (30%) of normal on attempted extension testing, as measured according to the Standards of Packard Thurber. (Head Aff., ¶ 4). Dr. Head opines "to a reasonable degree of medical certainty that [Benjamin's] neurological examination disclosed significant restriction of cervical and lumbosacral range of motion when compared to the normal function of these areas." (Id.). In addition, Dr. Head indicates that Benjamin's "complaints of headaches, neck pain, low back pain and bilateral leg pain is [sic] a natural and expected medical consequence of the trauma from the motor vehicle accident of September 10, 1999 * * * [and] are consistent with a decreased range of motion * * * in his cervical and lumbosacral spine." (Id.).

In his affidavit, Dr. Head further opines "to a reasonable degree of medical certainty" that Benjamin's injuries are "a direct result of the motor vehicle accident of September 10, 1999." (Head Aff., ¶ 5). However, in his notes, Dr. Head indicates that "absent any history to the contrary," Benjamin's injuries were a direct result of the September 10, 1999 motor vehicle accident. Moreover, Dr. Head indicates that based upon his review of the available medical records and his examination of Benjamin, his opinion is that Benjamin's injuries "have caused him to experience significant pain and dysfunction and have interfered with his ability to engage in his usual and customary daily activities and his work as a long-haul truck driver." (Id.).

12

B.    Procedural History

On August 16, 2002, plaintiffs commenced this diversity action[8] against, *inter alia,*

Sureway and Galdamez to recover damages for personal injuries allegedly sustained by Benjamin

as a result of the motor vehicle accident.  Specifically, Benjamin alleges that he sustained "a

cervical and lumbar disc injury;" "chronic disc injuries" at the C6-C7, L3-L4 and L4-L5 levels;

"chronic neck and low back pain, numbness and tingling in his right hand and right thigh, leg

pain and weakness * * * headaches, difficulty in chewing, clicking sound in jaw joint, facial

muscle pain, ringing in ears and decrease pressure in left ear." (Plaintiffs' Response to

Interrogatories, ¶ 10).  In addition, Benjamin claims that he was totally incapacitated from his

employment and daily activities from October 15, 1999 to December 17, 1999, a total of sixty-

four (64) days.  (Id. ¶ 14).  Wanda asserts derivative claims for loss of consortium.  On August 7,

2003, plaintiffs filed an amended complaint adding Lynxways as a party defendant.

By stipulation dated June 17, 2004, Galdamez and Lynxways agreed to indemnify and

defend Sureway against plaintiffs' claims and to convert Sureway's cross-claims against them

into third-party claims, and Sureway agreed to discontinue its claims against Galdamez and

Lynxways without prejudice[9].

---

[8]  Plaintiffs are citizens of Maryland.  Sureway is a New York corporation.  Galdamez is a
citizen of New Jersey.  The parties implicitly agree that this case is governed by New York
substantive law.

[9]  Pursuant to New York's anti-subrogation rule, which provides that an insurance carrier
cannot sue its own insured for the very risk for which the insured was covered, once Lynxways
and Galdamez's insurer agreed to defend and indemnify Sureway, Sureway's cross claims and
third party claims against Lynxways and Galdamez were extinguished.  See, e.g. Pennsylvania
General Ins. Co. v. Austin Powder Co., 68 N.Y.2d 465, 468, 510 N.Y.S.2d 67, 502 N.E.2d 982
(1986)(affirming dismissal of cross-claims for indemnification where insured expressly agreed to
indemnify the party from whom the insurer's rights are derived); Antonitti v. City of Glen Cove,

13

Defendants now move pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment dismissing the complaint in its entirety.

II.    ANALYSIS

A.    Summary Judgment Standard

Summary judgment should not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material "if it might affect the outcome of the suit under the governing law." Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001). An issue of fact is genuine only if a jury could reasonably find in favor of the nonmoving party based on that fact. See id. The moving party bears the initial burden of establishing the absence of any genuine issue of material fact, after which the burden shifts to the nonmoving party to establish the existence of a factual question that must be resolved at trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The trial court is required to construe the evidence in the light most favorable to the nonmoving party, and draw all reasonable inferences in its favor. See Id. at 252, 106 S.Ct. 2505; Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2d Cir. 1996).

B.    Local Rule 56.1 Statement

_____

266 A.D.2d 487, 488-489, 698 N.Y.S.2d 722 (2d Dept. 1999)(dismissing the City's third-party complaint for indemnity pursuant to the anti-subrogation rule). Accordingly, those claims are dismissed.

Plaintiffs contend that defendants' motion should be denied because they failed to file a statement in compliance with Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York (Local Rule 56.1).

Local Rule 56.1 states, in pertinent part, as follows:

> Upon any motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, there shall be annexed to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement may constitute grounds for denial of the motion. (Emphasis omitted).

Nonetheless, district courts have broad discretion to overlook a party's failure to comply with the local court rules. Holtz, 258 F.3d at 73; see also Banco Central de Paraguay v. Paraguay Humanitarian Foundation, Inc., No. 01 CIV 9649, 2005 WL 53271, at * 9 (S.D.N.Y. Jan. 7, 2005)(overlooking defendants' failure to submit a statement pursuant to Local 56.1 with the notice of motion based on is broad discretion to excuse violations of the local rules); Weiss v. Delta Dallas Alpha Corp., No. 02 CV 2484, 2004 WL 1636997, at * 1 (S.D.N.Y. Jul. 21, 2004)(holding that a district court is vested with the discretion to overlook a party's failure to comply with Local Rule 56.1). A district court "may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement [pursuant to Local Rule 56.1]." Holtz, 258 F.3d at 73.

Although I do not condone defendants' failure to comply with the local court rules, since the record is not voluminous, I will exercise my discretion "to conduct an assiduous review of the record" and determine defendants' motion for summary judgment on the merits.

B.    Plaintiffs' Claims against Lynxways

Defendants contend that plaintiffs' direct claims against Lynxways are time-barred because they were not commenced within three years of the date of the accident. Plaintiffs do not address this branch of defendants' motion.

Plaintiffs did not commence an action against Lynxways within the applicable three year statute of limitations period pursuant to N.Y. C.P.L.R. § 214(5), and they do not allege or otherwise establish that their claims against Lynxways relate back to the original complaint, see, e.g. Sowa v. S.J.N.H. Realty Corp., 21 A.D.3d 893, 800 N.Y.S.2d 749, 752 (2d Dept. 2005)(holding that the plaintiff bears the burden of proving that the relation back doctrine is applicable by demonstrating, *inter alia*, that the defendants are united in interest), or that Lynxways is united in interest with any of the other defendants, see N.Y. C.P.L.R. § 203. Accordingly, plaintiffs' direct claims against Lynxways are dismissed as time-barred.

C.    Serious Injury

New York's Comprehensive Motor Vehicle Insurance Reparations Act (the No-Fault Law) provides, in pertinent part, that "in any action * * * for personal injuries arising out of negligence in the use or operation of a motor vehicle * * *, there shall be no right of recovery for non-economic loss, except in the case of a serious injury, * * *." N.Y. Ins. Law § 5104(a). The No-Fault Law defines "serious injury" as follows:

> "[A] personal injury which results in [1] death; [2] dismemberment; [3] significant disfigurement; [4] a fracture; [5] loss of a fetus; [6] permanent loss of use of a body organ, member, function or system; [7] permanent consequential limitation of use of a body organ or member; [8] significant limitation of use of a body function or system; or [9] a medically determined injury or impairment of a

non-permanent nature which prevents the injured person from performing
substantially all of the material acts which constitute such person's usual and
customary daily activities for not less than ninety days during the one hundred
eighty days immediately following the occurrence of the injury or impairment."

N.Y. Ins. Law § 5102(d).

The plaintiff has the initial burden to establish a prima facie case of serious injury within
the meaning of the statute. See Licari v. Elliott, 57 N.Y.2d 230, 240, 445 N.Y.S.2d 570, 441
N.E.2d 1088 (1982). The No-Fault Law requires "objective proof of a plaintiff's injury in order
to satisfy the statutory serious injury threshold." Toure v. Avis Rent A Car System, Inc., 98
N.Y.2d 345, 350, 746 N.Y.S.2d 865, 774 N.E.2d 1197 (2002)(internal quotations and citation
omitted). It is for the court to determine, as a threshold matter, whether or not a prima facie case
of serious injury has been established. See Licari, 57 N.Y.2d at 237-238, 455 N.Y.S.2d 570; see
also Carter v. Geldis, No. 00 CV 7236, 2002 WL 1159904, at * 5 (E.D.N.Y. Apr. 23,
2002)(holding that the court must make a threshold determination of whether a jury could find
that a plaintiff suffered a serious injury, or whether as a matter of law the injury suffered is of a
type that should be excluded from judicial remedy). Summary judgment in favor of a defendant
is justified when the evidence would not warrant a jury finding that the injury falls within one of
the nine categories set forth in the No-Fault Law. See Williams v. Ritchie, 139 F.Supp.2d 330,
334 (E.D.N.Y. 2001).

Defendants contend that Benjamin has not suffered a "serious injury" within the meaning
of the No-Fault Law. Plaintiffs contend, as an initial matter, that defendants' motion should be
dismissed because they fail to submit medical proof in admissible form. Plaintiffs claim that, in
any event, Benjamin sustained a "serious injury" within the meaning of the No-Fault law insofar

17

as he suffered a "permanent consequential limitation of use of a body organ or member" and/or a "significant limitation of use of a body function or system."[10]

### 1. Defendants' Proof

On a motion for summary judgment, the defendant bears the initial burden of submitting competent medical evidence showing that the plaintiff has not sustained a serious injury. See Tarnopolsky v. Sanchez, No. 01 CV 5020, 2002 WL 31409927, at * 2 (E.D.N.Y. Sept. 27, 2002); see also Byrne v. Oester Trucking, Inc., 386 F.Supp.2d 386, 392 (S.D.N.Y. 2005). In order to sustain his or her burden, the defendant may rely on the unsworn reports from the plaintiff's treating physicians, but any reports from the defendant's own physicians must be in the form of affidavits or affirmations. See Stein v. Bentor, No. 03 CV 5488, 2005 WL 2244831, at * 6 (E.D.N.Y. 2005); Gualtieri v. Farina, 283 F.Supp.2d 917, 921 (S.D.N.Y. 2003); see also Williams, 139 F.Supp.2d at 334 (holding that the defendants must provide evidence from their own physicians in the form of sworn affidavits, but treating the sworn reports of the defendant's doctors as sworn affidavits).

Once the defendant has met his or her burden, the burden shifts to the plaintiff to submit objective medical evidence that raises a genuine issue of fact. See, Toure, 98 N.Y.2d at 352, 746 N.Y.S.2d 865; see also Keller v. Gleeson, No. 02 CV 2297, 2004 WL 1373164, at * 2 (E.D.N.Y.

---

[10] Plaintiffs do not allege that Benjamin sustained "a medically determined injury or impairment of a non-permanent nature which prevents [him] from performing substantially all of the material acts which constitute [his] usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment." Accordingly, I will not address that branch of defendants' motion relating to this category.

June 16, 2004)(holding that once the defendant establishes a prima facie case, the burden shifts to the plaintiff to present evidence in admissible form establishing the existence of facts upon which an inference of a serious injury within the meaning of the No-Fault Law could be based). A plaintiff may sustain his or her burden by submitting admissible evidence in the form of a sworn physician's affidavit or affirmation. See Stein, 2005 WL 2244831, at * 6; Williams, 139 F.Supp.2d at 334. Subjective complaints of pain alone are insufficient to establish serious injury. See, Byrne, 386 F.Supp.2d at 393; Geldis, 2002 WL 1159904, at * 5.

On its motion for summary judgment, defendants submitted, *inter alia*, the sworn narrative reports of two doctors who examined Benjamin and reviewed his medical records, an affirmation of a third doctor regarding his review of the diagnostic tests performed on Benjamin, the medical records from Benjamin's treating physicians, and a videotape of surveillance conducted on Benjamin showing his physical capabilities. Contrary to plaintiffs' contention, this evidence was sufficient to satisfy defendants' initial burden of showing that Benjamin did not sustain a serious injury within the meaning of the No-Fault Law. See, e.g. Byrne, 386 F.Supp.2d at 392 (finding that the defendants met their burden by submitting the reports of two doctors who examined the plaintiff and a third doctor who reviewed the plaintiff's radiology report); Tarnopolsky, 2002 WL 31409927, at * 3 (finding that the reports of two doctors who examined the plaintiff and reviewed his medical records and diagnostic test results, together with the plaintiff's deposition testimony, which failed to specify any activities in which the plaintiff was prevented from engaging, was sufficient to establish a prima facie case that the plaintiff did not suffer a serious injury); Geldis, 2002 WL 1159904, at * 6 (finding that defendant established a prima facie case by submitting the affirmations of two doctors who examined the plaintiff and

reviewed his medical records and diagnostic test results, and the deposition testimony of the plaintiff); Williams, 139 F.Supp.2d at 335 (finding that the defendants established a prima facie case by submitting sworn reports of two doctors who examined the plaintiff). The burden, thus, shifted to plaintiffs to submit competent medical evidence based upon objective medical findings and diagnostic tests establishing that Benjamin sustained a serious injury within the meaning of the statute.

    2.    Significant Limitation of Use of a Body Function or System

"Whether a limitation of use or function is 'significant' or 'consequential' * * * relates to medical significance and involves a comparative determination of the degree or qualitative nature of an injury based on the normal function, purpose and use of the body part." Toure, 98 N.Y.2d at 353, 746 N.Y.S.2d 865 (internal quotations and citation omitted). In order to establish a prima facie case under the "significant limitation" category, the plaintiff must show a significant limitation in both degree and duration. Hodder v. United States, 328 F.Supp.2d 335, 349 (E.D.N.Y. 2004); Gualtieri, 283 F.Supp.2d at 925. Medical evidence demonstrating that a plaintiff's limitations have been objectively measured and quantified is sufficient to establish a significant limitation of use of a body function or system. See Tarnopolsky, 2002 WL 31409927, at * 5; see also Hodder, 328 F.Supp.2d at 349 (holding that in order to establish a "significant limitation of use" claim, the significance of the limitation must be supported by credible medical evidence and must be objectively measured and quantified).

Although a diagnosis of loss of range of motion, alone, is insufficient to support an objective finding of a serious injury, see Hodder, 328 F.Supp.2d at 349, "an expert's designation

of a numeric percentage of a plaintiff's loss of range of motion can be used to substantiate a claim of serious injury." Toure, 98 N.Y.2d at 350, 746 N.Y.S.2d 865; see also Carter v. Atlantic Greyhound Lines of VA, Inc., No. CV-02-0393, 2005 WL 1692639, at * 6 (E.D.N.Y. Jul. 5, 2005)(accord); Stein, 2005 WL 2244831, at * 6 (accord). In addition, "an expert's qualitative assessment of a plaintiff's condition also may suffice, provided that the evaluation has an objective basis and compares the plaintiff's limitations to the normal function, purpose and use of the affected body organ, member, function or system." Toure, 98 N.Y.2d at 350, 746 N.Y.S.2d 865 (emphasis omitted). Furthermore, the objective medical findings made by the plaintiff's expert must be based upon a recent examination of the plaintiff. See Hodder, 328 F.Supp.2d at 349.

The evidence submitted by plaintiffs in opposition to defendants' motion is sufficient to raise a triable issue of fact regarding whether Benjamin sustained a significant limitation of use of a body function or system. Specifically, in his affidavit, Dr. Head indicates, *inter alia*, that he administered range of motion tests on Benjamin on August 19, 2004, almost five years after the accident, which revealed that the range of motion of Benjamin's cervical and lumber spine were restricted at thirty percent (30%) of normal as measured according to the Standards of Packard Thurber. (Head Aff., ¶ 4). See Atlantic Greyhound, 2005 WL 1692639, at * 6 (finding that plaintiffs raised issues of fact as to serious injury by submitting an expert's affidavit indicating that the results of the majority of his range of motions tests showed limitations of twenty percent or more); Ajnoha v. Demetrio-Mejia, No. 03 Civ. 2464, 2005 WL 1330969, at * 3 (E.D.N.Y. June 3, 2005)(finding that the plaintiff raised triable issues of fact by submitting, *inter alia*, an affidavit from his treating physician indicating that the plaintiff sustained a bulging disc

21

compromising the thecal sac at L4-L5 and that he continued to suffer from limited range of motion in the cervical and lumbar spine almost three years after the accident); Tarnopolsky, 2002 WL 31409927, at * 5 (finding that the doctor's objective findings that the plaintiff suffered from a limitation of 10 degrees of motion in both his cervical and lumbar spine was sufficient to create a triable issue of fact precluding summary judgment); see also Hodder, 328 F.Supp.2d at 356 (finding that the cases have generally found that a limitation of twenty percent or more is significant for summary judgment purposes and collecting cases). Dr. Head's finding is corroborated, in part, by defendants' own expert, Dr. Neystat, who indicated that her examination of Benjamin on May 19, 2004 revealed limited range of motion of the lumbar spine and positive straight leg raise testing[11]. Accordingly, there are triable issues of fact regarding whether Benjamin sustained significant limitations of the function of his cervical and lumbar spine in both degree and duration sufficient to preclude summary judgment.

Moreover, even if Benjamin's injuries were merely exacerbations of a pre-existing injury, as suggested by defendants, summary judgment is still not appropriate, as exacerbations of pre-existing injuries may constitute a serious injury within the meaning of the New York No-Fault Law. See, e.g. Stein, 2005 WL 2244831, at * 8 (finding that the plaintiff's doctor's opinion that the pre-existing disc bulging was asymptomatic prior to the motor vehicle accident and, thus, that all symptoms were directly related to the accident, was sufficient to preclude summary judgment).

---

[11] Straight leg raising tests are considered objective evidence because it is not based on a patient's subjective complaints of pain. See Hodder, 328 F.Supp.2d at 349; see also Atlantic Greyhound, 2005 WL 1692639, at * 7 (recognizing leg raising tests as objective range of motion testing).

In addition, Dr. Head's conclusion that Benjamin's injuries are casually related to the September 1999 accident is corroborated by Dr. Ciganek's and Dr. Hermantin's deposition testimony. Any conflict between the opinions of those doctors and the opinions of defendants' doctors are questions of credibility for the finder of fact. See, e.g. Keller, 2004 WL 1373164, at * 2 (holding that the conflicting experts' reports constituted an additional reason why summary judgment should be denied); Williams, 139 F.Supp.2d at 338 (holding that ordinarily, discrepancies in physicians' reports involve issues of credibility which are for a jury to determine). "When supported by objective evidence, an expert's qualitative assessment of the seriousness of a plaintiff's injuries can be tested during cross-examination, challenged by another expert and weighed by the trier of fact." Toure, 98 N.Y.2d at 351, 746 N.Y.S.2d 865. Likewise, any deficiency in plaintiffs' experts' opinions, such as, for example, their reliance on an incomplete history or incomplete medical records, merely goes to the weight a fact-finder should accord their opinion, and does not warrant granting summary judgment.

3.      Permanent Consequential Limitation of Use of a Body Organ or Member

Dr. Head's findings of continued limited range of motion almost five years after the accident are also sufficient to support an inference of permanency. See, e.g. Ajnoha, 2005 WL 1330969, at * 3 (finding that although the plaintiff's physician did not explicitly describe his injuries as permanent, his findings of continued limited range or motion three years after the accident were sufficient to support an inference of permanency under the "permanent consequential limitation" category). Accordingly, there are triable issues of fact regarding whether Benjamin sustained a permanent consequential limitation of use of a body organ or

23

member sufficient to defeat summary judgment.

Since the issue of serious injury cannot be decided as a matter of law, defendants' motion is denied.

III. CONCLUSION

Defendants' motion for summary judgment is denied. The parties are directed to appear in my courtroom at 1010 Federal Plaza, Central Islip, New York on January 9, 2006 at 12:00 p.m. for a settlement and/or scheduling conference with authority or persons with authority to resolve this action. Further, the parties are directed to engage in good faith settlement negotiations prior to the conference.

SO ORDERED.

SANDRA J. FEUERSTEIN
United States District Judge

Dated: December 2, 2005
Central Islip, New York

Copies to:

Weitz & Luxenberg, P.C.
180 Maiden Lane, 17th Floor
New York, New York 10038-4925

Miller & Associates
One Battery Park Plaza, 28th Floor
New York, New York 10004

White, Fleischner & Fino, LLP
140 Broadway, 36th Floor
New York, New York 10005

24